WESTERN ELECTRIC CO. v. CITIZENS' TEL. CO. et al.

(Circuit Court, W. D. Michigan, S. D. January 9, 1901.)

1. PATENTS—EXPIRATION—PRIOR FOREIGN PATENT.

Where any of the claims of a United States patent include any substantive part of the invention, on which an independent claim might be founded, shown by a prior foreign patent, the former expires with the expiration of the latter, under Rev. St. § 4887; and, when the foreign patent contains no formal claims, it will be presumed that the law of the country does not require them, and the specification and drawings will be looked to for the purpose of determining the matter of the invention, and whether it would sustain any of the claims of the American patent.

2. SAME—TELEPHONE EXCHANGE SYSTEM.

The Eldred patent, No. 303,714, for improvements in telephone exchange systems and apparatus, issued in 1884, expired in 1887 with the expiration of the prior Italian patent issued to the same patentee in 1884 for a term of three years.

In Equity. Suit for infringement of patent. On final hearing.

Barton & Brown, for complainant.
Bundy & Travis (Chas. C. Bulkley, of counsel), for defendants.

SEVERENS, Circuit Judge. The complainant is the owner by assignment of the rights secured by letters patent No. 303,714, issued August 19, 1886, to Horace H. Eldred for improvements in telephone exchange systems and apparatus. The invention relates, says the patentee, "to a method of intercommunication known as the 'district exchange telephone system,' and it consists, in general, of a central or exchange station, which is connected with a number of substations by means of telegraphic or telephonic lines radiating therefrom, these latter being so organized and arranged that any two of the substations may be placed at a moment's notice in direct telegraphic or telephonic communication with each other by the act of an attendant at the central or exchange station, who, upon being notified to do so, connects together the two lines leading to the respective substations, so that they are enabled thereafter to communicate with each other directly." It consists, he says, "in the combination with a series of telephone lines converging to a central station from a corresponding number of substations, hereinafter termed 'substation lines,' of a switch board consisting of a series of spring jacks (one for each line) for the insertion of wedges or other equivalent devices for effecting changes in the connections of the several lines, and a series of visual signals or annunciators (one for each line) for indicating the particular line or spring jack with which a connection is required to be made, one of these visual signals placed on each line at a point between the said spring jack and the earth, to which all the lines are normally connected, whereby, when any two independent lines are temporarily disconnected from the earth and coupled together to form a combined circuit, their corresponding annunciators are excluded therefrom." He further states that his invention includes other described apparatus whereby the users of the telephones at the substations may notify the central office when they are through with their connection,

and of a combination therewith of a signal sending and receiving apparatus and telephone at the central station, and other apparatus whereby the current is taken through said signaling apparatus and telephone to the earth. The specifications assume, without description, the existence at the patron's substation of a telephone comprising a generator with means for exciting it, and a ground wire or equivalent, and a transmitter and receiver, together with a line connection to the central station. The means employed, so far as they are material to be understood for the present purpose, may be most conveniently described in connection with the mode of operation, only so much thereof being described as relates to the essence of the invention. The line from the calling patron on coming into the office is brought to a switch jack, located upon the switch board, upon which latter the principal part of the exchange apparatus is located. The spring jack is so constructed that when in its normal condition it serves as a conductor, and a line running from the opposite end of the switch jack from that to which the main line has been attached, as above stated, to the apparatus actuating the annunciator, throws down the shield in front thereof, and discloses a plate bearing the number of the calling patron who sends in a call over his line. This being seen, the attendant at the exchange inserts a wedge or plug, secured to one end of a connecting cord, between the spring of the jack and its seat, whereby the current is cut out from the annunciating apparatus and is taken through the connecting cord and a line attached to its middle to the office telephone. From there the operator calls the patron to give the number wanted, and, upon getting an answer, inserts a plug on the other end of the connecting cord in the proper switch jack for connecting with the line of the patron called, and, having called him, and received an answer to his signal, switches his own telephone out of circuit, and the substations are connected. After the conversation is finished, one or the other of the parties who have been engaged, by operating the signaling apparatus, produces an indication upon another annunciator at the exchange office, whereby it is known that the lines may be disconnected. This is, in outline, the scheme of the patent. All of the means employed were familiar at the date of Eldred's invention, and need not, therefore, be more particularly described. The claims are numerous. The first and second are the only ones relied upon. But they contain the substance of the invention on which the patent rests. They are as follows:

"(1) The combination, substantially as hereinbefore set forth, of a series of telephone lines converging to a central or exchange station from different substations, a series of visual signals or calling annunciators, $W^1$, $W^2$, $W^3$, $W^4$, $W^5$, $W^6$, one of which is placed in each line at a point between its spring jack and the earth, whereby the annunciators are cut out while talking. (2) The combination, substantially as hereinbefore set forth, of a series of telephone lines converging to a central or exchange station from different substations, movable switches and conductors 7, 8, etc., at said central station, whereby direct communication can be established between any two substations by connecting both their respective lines together, and an auxiliary or supplemental signaling apparatus, $R^1$, etc., included in each of said connecting conductors, whereby the substations so connected, or either of them, may notify the attendant at the central station to disconnect the said lines."

With regard to the first claim the evidence leaves no doubt that at that time telephone exchanges had for some years been in use which employed all the elements Eldred included therein. But they were not all located in the same relation, not including in this reference the structures which are claimed to have been anticipations. In former constructions the annunciator was located between the substation of the caller and the spring jack, and thus the current was impeded by its presence during the conversation which followed. This was thought to be a serious objection. It was overcome by Eldred, who removed the annunciator to a point beyond the switch jack, reckoning from the calling substation, and thereby put it out of the way as soon as the current was diverted by entering the wedge of the connecting cord into the spring jack, which also opened the connection between the switch jack and the annunciator. This is the foundation on which the first claim rests. Then, as to the second claim, theretofore there had not been in use—speaking, as before, without reference to alleged anticipations—adequate means of ascertaining when the patrons who were using the lines had finished communicating, except by switching the office telephone into the circuit and "listening in," as it is called. This was not only labor for the attendant, but was annoying to the patrons. The locating by Eldred of an annunciator on the connecting cord between the two wedges or plugs obviated these objections by enabling the patrons themselves to indicate when they had finished their conversation; and this is the new feature upon which the second claim rests. The complainant charges the defendants with infringing both of these claims.

Several grounds of defense are relied upon. It is claimed first that the Eldred patent has expired by reason of the limitations of patents which he took out in Great Britain, France, and Italy for the same invention prior to the issue of the patent in the United States, which foreign patents had expired before the commencement of this suit. The foreign patents were all applied for and granted in 1884, but, although Eldred applied for his home patent April 28, 1880, it was not granted until August 19, 1884, which was after the date of the foreign patents. It is claimed, second, that the patent in suit was anticipated by a British patent to McClure, granted in April, 1879. To this the complainant, conceding that the patent would be fatal to the patent in suit if Eldred's invention had not preceded the McClure patent, replies that Eldred's invention was made and reduced to practice in this country in the autumn of 1878, nearly two years prior to his application; thus antedating the grant of the McClure patent in Great Britain. And further it is claimed, third, that Eldred's invention was anticipated by certain prior uses in this country, notably at New Haven and Meriden, Conn. These are the principal defenses.

Recurring now to the foreign patents, it is to be observed upon the proofs that they are not sufficiently authenticated. But their admission was not objected to on that account. The objection is made, however, that the laws of the foreign countries in which the patents were granted are not proven. This is the fact. But, in my opinion, the only effect of this is that there is nothing in the proofs

to show when the foreign patents expired, unless it appeared upon the face of the patents what the limitation in that regard was. The British and French patents do not indicate their duration. But the Italian patent does. As to the others, it may be that the court ought to take notice of such a fact, it being within the range of information conveyed by encyclopedias and other repositories of facts of general interest. However, it is not important, as the patents are alike, differing only to the extent of variations in expression occasioned by their being in different languages. The duration of the Italian patent is limited to three years, and, of course, it had expired long before the commencement of the present suit. The question, then, is whether the Eldred invention covered by his home patent was patented by the one taken out in Italy, or, putting it another way, and with rather more precision, do its claims, or any of them, include the invention, or some substantive part of the invention, on which an independent claim might be founded, shown by the Italian patent? There being no formal claims in the latter patent, it is prima facie to be presumed that the law of Italy does not require it. And the further inference arises that whatever is new either in a single element, or in a combination of several elements, such as might stand for a claim under our own statute, would be covered by the patent. Our statute requiring claims to be expressly made is for the purpose of settling in a definite way what the invention or inventions are, and the claims are deductions from the specifications. It is understood, therefore, that, where formal claims are dispensed with, the matter of the invention is gathered from the specifications and the drawings or models. A careful study of the Eldred Italian patent leaves no doubt that it does embody the very matter of many of the claims in his home patent; that is to say, very many of the claims of the latter could be well founded on the specifications of the former. It is true that in each of these foreign patents it is stated that the object which the patentee had was to provide a system of telephonic apparatus suitable for large cities where the necessity would exist for more than one exchange station, and he suggests the use of trunk lines between them, and the manner of such use. But the large system is but a duplication of the single exchanges in connection, and the methods of the single exchange permeate the whole. In his home patent Eldred states his invention to be of "improvements in telephone exchange systems and apparatus." In the British patent the statement is the same, adding, "part of which improvements is also applicable to other similar purposes." The statement is substantially the same in the Italian and French patents. And in the British patent, as well as in others, he expressly states:

"This invention relates to that system of telephonic intercommunication for private and business purposes which consists of a number of telephone lines assembled together and so organized that each individual line establishes a direct means of communication between one or more subscribers and a central or connecting office. By means of such an organization each subscriber or other authorized person provided with a telephone or other equivalent instrument may at any time, through the intervention of the central office with which he is immediately connected, be placed in direct communication with any other subscriber who is connected in like manner with such

central office, which is technically termed an exchange office;" and, further, that "the invention comprises certain improvements in the construction of switch boards, switches, and apparatus for establishing the connection between different lines so that the same may be effected with the utmost convenience and celerity. The switch board at the central station consists preferably of an upright case, the upper portion of which is divided into boxes or compartments arranged in rows, the upper one being reserved especially for trunk and connecting lines. Each one of these compartments is appropriated to a particular line, either a substation line or a trunk line, as the case may be, and it contains all the especial apparatus pertaining to that particular line. The operator's table may be attached to the case containing the switch board, and project horizontally in front of it, or it may, if desired, consist of a detached table. Upon this table are mounted the connecting devices for establishing communication between one line and another, and also the general apparatus for speaking and signaling, which is designed for the use of the operator or attendant in conversing with the subscribers and in making connections. The special apparatus belonging to each individual line consists of a visual signal or annunciator for receiving signals, a key for transmitting signals, and a spring jack or device whereby the connections with other lines are formed."

He then goes on to describe with great minuteness all the details of the single exchange, and, after describing it, the patentee goes on to say:

"The peculiar arrangement of the electric circuits which forms the principal features of this part of the invention will be best understood by tracing the connections of one of the wires," etc.

To the British patent are appended nine claims, eight, at least, of which are founded on the details of the single exchange office, and are for combinations or congeries thereof. Identical claims are appended to the French patent. With respect to most of these claims, if one were allowed to substitute equivalents, they could be made upon the specifications of the home patent. But, what is more directly to the point, the essence of the patent in suit contained in the first claim thereof, namely, the cutting out of the annunciator from the circuit employed for conversation, is embodied in the description of the invention in the foreign patents. The construction given in the specifications necessarily involves it. The case is, therefore, brought under the operation of the rule laid down in Siemens' Adm'r v. Sellers, 123 U. S. 276, 8 Sup. Ct. 117, 31 L. Ed. 153, even though it be conceded that there are differences in some details between the foreign and the home patents upon which independent claims might be based. If the home patent cannot expire in parcels, and the Italian patent, for instance, covered the matter of the first claim of the patent in suit, it necessarily follows that the home patent expired with the Italian patent three years after the issue of the latter, and from this it necessarily results that the complainant must fail, and that the bill should be dismissed.