UNITED SHOE MACHINERY CO. v. DUPLESSIS SHOE MACHINERY CO.

(Circuit Court, D. Massachusetts. July 9, 1906.)

No. 102.

1. PATENTS—LENGTH OF TERM—PRIOR FOREIGN PATENT.

Formal identity of claims is not necessary to constitute identity of a United States and a foreign patent, within the purview of Rev. St. §.4887 [U. S. Comp. St. 1901, p. 3382], but substantial identity of the invention as covered by the claims is sufficient.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 188½–191.]

2. SAME—EFFECT OF TREATY.

Article 4 bis, inserted in the international convention for the protection of industrial property of March 20, 1883, by the additional act proclaimed by the President, August 25, 1902 (32 Stat. 1936, 1939), did not have the effect of changing the term of a patent granted by the United States to a citizen thereof, as that term is fixed by statute; and such a patent, granted prior to January 1, 1898, and which is limited by the provisions of Rev. St. § 4887 [U. S. Comp. St. 1901, p. 3382], to the term of a prior foreign patent for the same invention, is not extended by such additional act.

3. SAME—EXPIRATION—SOLE SEWING MACHINES.

The French and Meyer patent, No. 412,704, for a sole sewing machine, expired September 17, 1902, with the expiration of the term of the prior British patent, No. 13,366, of 1888, granted to the same patentees for substantially the same invention.

In Equity.

See 133 Fed. 930.

Elmer P. Howe and Benjamin Phillips, for complainant.

T. Hart Anderson, for defendant.

LOWELL, Circuit Judge. This is a bill in equity filed December 21, 1903, to restrain the infringement of letters patent No. 412,704, issued October 8, 1899, to French and Meyer for an improvement in sewing machines. All the claims are in issue as follows:

"(1) In a chain-stitch wax-thread sole-sewing machine, the following instrumentalities, viz.: A channel-guide, a hooked needle, the needle-segment, feeding mechanism, actuating means for the said needle-segment, as the link, $B^3$, lever, $B^4$, and cam, 200, to force the needle with a loop upon its shank into the stock and out through the inner channel of the sole, and there hold the said needle temporarily substantially at rest while the stitch is being set, a thread-guide, means to actuate it to supply the hooked needle with thread, and a take-up, as $b^2$, a cam, as $C^1$, and connecting devices intermediate the said cam and the said take-up, the said cam through the said connecting devices actuating the said take-up to pull upon the loop of needle-thread about the shank of the needle while the needle is in the stock and holds the said loop upon its shank, the said take-up drawing the said loop about the shank of the needle, as described, to set the last stitch, of which the said loop forms a part, without straining the between substance, the said stitch being set before the loop to form the next stitch is drawn through it, substantially as described.

"(2) In a chain-stitch wax-thread sole-sewing machine, a hooked needle, a thread-guide to supply it with thread, feed mechanism to feed the stock while the hooked needle holds on its hook a loop of thread, and means to actuate the said needle to force it into the upper and sole and out through the channel therein and temporarily hold the said needle substantially at rest in the stock, combined with a take-up, as $b^2$, and means to actuate it to act upon the thread and draw the same back through the sole and upper while the last loop formed by the needle is yet on the shank of the needle, the needle yet remaining in the stock, the said take-up completing the setting of the stitch before the said needle is withdrawn from the stock and out from the old loop upon its shank, substantially as described.

"(3) In a chain-stitch wax-thread sole-sewing machine, a hooked needle, means to actuate it to enter the upper and sole and emerge therefrom in the inner channel thereof, and a thread-guide and means to actuate it to supply the hook of the needle with thread, combined with a feeding mechanism, a take-up, a cam, and intermediate devices to actuate the said main take-up to draw the thread about the shank of the needle and set the stitch while the needle is in the stock and the loop of thread last drawn through the stock by it is yet

on the shank of the needle, the said cam and intermediate devices at the same time moving the take-up far enough to draw thread from the thread-supply sufficient for a new stitch, and with an auxiliary spring-actuated take-up to take up the slack in the needle-thread drawn off by the main take-up, the said auxiliary take-up thereafter giving up the said slack thread to the needle as the latter again acts to draw a loop of thread through the stock, substantially as described.

"(4) In a chain-stitch wax-thread sole-sewing machine, the take-up, $b^2$, and the auxiliary take-up, $b^5$, the thread-guide, and the hooked needle and actuating means therefor, combined with the thread-holder, d, and means to actuate it, whereby the said thread-holder is made to act upon the needle-thread between the said thread-guide and the stock, and while the needle is in the stock and the last loop of thread drawn therethrough is yet upon the shank of the needle, the said threadholder taking from the auxiliary take-up and through the said thread-guide before the latter acts to lay its thread in the hook of the needle a sufficient quantity of thread to prevent the rending of the same across the hook of the needle as the loop is being drawn by the needle through the stock, substantially as decribed.

"(5) In a chain-stitch wax-thread sole-sewing machine, a hooked needle, a thread-guide to supply the needle with thread, means to actuate the needle to draw the thread in the form of a loop from the inner channel of the sole through the between substance and upper, feeding mechanism to move the sole, and means to move the needle forward to pass through the upper and between substance and come substantially at rest, combined with a take-up, as $b^2$, and means to actuate it while the needle is in the stock to pull upon the loop of thread yet on the shank of the needle next the outer side of the shoe, and pull the said thread back through the upper and about the said needle, to set the stitch, the pull on the thread in setting the stitch being in the direction to draw the upper closely to the sole, substantially as described."

The defendant set up an earlier British patent issued to the same parties, No. 13,366, of 1888, application dated September 17, 1888. The following claims were relied upon:

"(1) In a sole-sewing machine, a hooked needle to enter the upper and sole, and emerge therefrom in the inner channel thereof, and a thread-guide to supply the hook of the needle with thread, combined with a take-up, as $b^2$, and a cam to operate it, whereby the thread is drawn upon by the take-up to set the stitch while the needle is in the material, and to also draw off thread from the thread supply, substantially as described.

"(2) In a sole-sewing machine, a hooked needle to enter the upper and sole, and emerge therefrom in the inner channel thereof, and a thread-guide to supply the hook of the needle with thread, combined with a main take-up, a cam to actuate it to draw the thread and set the stitch while the needle is in the stock, and the loop of thread last drawn through the stock is yet on the shank of the needle, and at the same time to draw off thread for a new stitch, and with an auxiliary spring actuated take-up to take up the slack in the needle thread drawn off by the main take-up, and thereafter give up the slack thread to the needle, as the latter acts to draw a loop of thread through the stock, substantially as described.

"(3) In a sole-sewing machine, the take-up, the thread-guide, and the hooked needle, combined with the threadholder and its attached rocking-shaft, whereby the threadholder is made to act upon the needle thread between the thread-guide and the stock, and while the needle is in the stock, and the last loop of thread drawn through the stock is yet on the shank of the needle, the said thread-holder taking from the take-up through the thread-guide before the thread-guide acts to lay the thread into the hook of the needle, a sufficient quantity of thread to prevent it rending through the hook of the needle as the loop is being drawn by the needle through the stock, substantially as described."

148 F.—3

The defendant contended that the above mentioned patents were identical, within the purview of Rev. St. § 4887 [U. S. Comp. St. 1901, p. 3382], and that, therefore, the patent in suit was limited by the term of the British patent, and so expired September 17, 1902, before this bill was brought.

The drawings of the British patent are identical with those of the patent in suit. The British specifications and claims are substantially identical with the American, as the latter were originally filed. The complainant admits that the specifications remain substantially identical. The specifications of the patent in suit speak of "chain-stitch wax-thread sole-sewing machines," while the specifications of the British patent speak of "chain-stitch," the "chain of the stitch," the "usual waxing device or thread supply." It was decided by the Court of Appeals for this Circuit in Westinghouse Electric Co. v. Stanley Instrument Co., 138 Fed. 823, that, in order to be within the purview of section 4887 identity of patents must appear in their claims. In the claims of the British patent no reference is made to wax-thread, but, considering the specifications and the nature of the invention, the omission is immaterial. The British claims do not mention a chain-stitch, but it appears from a consideration of the machine described that the British patentees had in mind only a chain-stitch machine, and that their invention had no practical application to any other. It is true that one of the complainant's experts testified that it is possible to embody the claims of the British patent in a lock-stitch machine; but this embodiment would be without practical use.

The complainant further seeks to differentiate the two patents by reason of the omission from claim 1 here in suit of all mention of drawing off thread from the thread supply, as mentioned in claim 1 of the British patent. The complainant urges that the gist of the former claim is a take-up, which sets the stitch, while in the British patent this take-up is necessarily combined with a draw-off or pull-off from the thread supply, this feature being absent from the American patent. The complainant also contends that claim 4 of the patent in suit differs from claim 3 of the British patent by the presence in the former of an auxiliary take-up in addition to the principal take-up. This is not found in the British claim 3, but it appears, in substance, in the British claim 2.

Considering that the original American application was the same as the British patent, and that it then embodied the same invention; considering, also, that the changes made in the American patent office did not and could not affect the substance of the invention set out in the original application, I can find in neither patent here in question evidence of "an essential, novel and patentable improvement on what was claimed" in the other. 138 Fed. 829. The mention made of a pull-off in British claim 1, and of an auxiliary take-up in American claim 4, involves nothing but a rearrangement of claims, and a restatement of the invention which they cover. Formal identity of claims is not necessary to constitute identity of patent, within the purview of section 4887. Substantial identity of invention, as covered

by the claims, is sufficient. This latter identity exists in the case at bar. It is unnecessary, therefore, to consider the dictum in Siemens v. Sellers, 123 U. S. 276, 283, 8 Sup. Ct. 117, 31 L. Ed. 153, and to determine if identity of some claims will shorten the life of others admittedly different.

The complainant further contends that, even if the patents are identical, yet the life of the American patent is extended by Article 4 bis, inserted in the international convention of March 20, 1883, for the protection of industrial property, by the additional act proclaimed by the President, August 25, 1902 (32 Stat. 1936, 1939). The article reads as follows:

"Patents applied for in the different contracting states by persons admitted to the benefit of the convention under the terms of articles 2 and 3 will be independent of the patents obtained for the same invention in the other states adherents or non-adherents to the Union. This provision will apply to patents existing at the time of its going into effect."

By Rev. St. § 4887, an American patent issued later than a foreign patent for the same invention was limited to expire not later than the foreign patent. By chapter 391 of the Acts of March 3, 1897 (29 Stat. 693, § 1 [U. S. Comp. St. 1901, p. 3382]), this limitation was repealed as to patents applied for on and after January 1, 1898. In Sawyer Spindle Co. v. Carpenter, 143 Fed. 976, the Circuit Court of Appeals for this Circuit decided that chapter 1019 of the Acts of March 3, 1903 (32 Stat. 1225, § 1 [U. S. Comp. St. Supp. 1905, p. 663]), did not revive a patent which had theretofore expired by virtue of section 4887. The patent there in suit had expired before the additional act was proclaimed, and so the article above quoted had no application to it.

The complainant contends that article 4 bis. is inconsistent with that provision of section 4887 which limits the term of the American patent by the term of the foreign. As the treaty is later than the Revised Statutes, and later than the amending act of 1897, the complainant contends that the treaty is to be taken as amending the amended statute, and hence that the American patent here in suit, having been in existence August 5, 1902, was prolonged by the treaty until 17 years from its issue.

The mutual relation of treaties and statutes under the Constitution of the United States has often been considered by the Supreme Court. Thus, in Geofroy v. Riggs, 133 U. S. 258, 266, 267, 10 Sup. Ct. 295, 33 L. Ed. 642, that court said:

"That the treaty power of the United States extends to all proper subjects of negotiation between our government and the governments of other nations is clear. It is also clear that the protection which should be afforded to the citizens of one country owning property in another, and the manner in which that property may be transferred, devised, or inherited, are fitting subjects for such negotiation, and of regulation by mutual stipulations between the two countries. As commercial intercourse increases between different countries, the residence of citizens of one country within the territory of the other naturally follows, and the removal of their disability from alienage to hold, transfer, and inherit property in such cases tends to promote amicable relations. Such removal has been within the present century the frequent subject of treaty arrangement. The treaty power, as expressed in the Constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its de-

partments, and those arising from the nature of the government itself and of that of the states. It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the states, or a cession of any portion of the territory of the latter without its consent. Ft. Leavenworth Railroad Co. v. Lowe, 114 U. S. 525, 541, 5 Sup. Ct. 995, 29 L. Ed. 264. But with these exceptions, it is not perceived that there is any limit to the questions which can be adjusted touching any matter which is properly the subject of negotiation with a foreign country."

On the other hand, it had been observed by the Supreme Court in the Head Money Cases, 112 U. S. 580, 598, 5 Sup. Ct. 247, 254, 28 L. Ed. 798:

"A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations, residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. An illustration of this character is found in treaties, which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens. The Constitution of the United States places such provisions as these in the same category as other laws of Congress by its declaration that 'this Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land.' A treaty, then, is the law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined; and when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute."

And in Whitney v. Robertson, 124 U. S. 190, 194, 8 Sup. Ct. 456, 31 L. Ed. 386, the court said:

"When the two [treaty and statute] relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other, provided always the stipulation of the treaty on the subject is self-executing."

The Supreme Court has laid down no rule by which this court can determine in all cases whether a particular provision of a treaty is to be deemed self-executing or not. If the intent of a treaty is to confer some right of American citizenship upon the citizens of another country, the treaty may be deemed self-executing, though its effect is to modify or repeal statutes concerning descent, taxation, confiscation, and perhaps even statutes relating to customs duties. Had the article of the convention here in question gone no further than to admit an alien to the rights of a citizen of the United States concerning patents, it might have been deemed self-executing; but to change the term of an American patent granted to a citizen of the United States as that term is fixed by statute, must be deemed beyond the authority of a treaty. Congress alone has power "to promote the

progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." Article 1, § 8. The treaty in question was not void or wholly ineffective, though it was not self-executing, but rather dependent upon congressional action. When, in the act of 1903, Congress gave effect to some of the provisions of the treaty, it omitted to deal with article 4 bis.

As the invention covered by the English patent is identical with the invention of the patent in suit, the latter expired with the former before this suit was brought.

The complainant's bill must be dismissed.