# AMERICAN TRI–ERGON CORPORATION v. PARAMOUNT PUBLIX CORPORATION.

## No. 5800.

District Court, E. D. New York.
Aug. 14, 1933.

Ward, Crosby & Neal, of New York City (S. Mortimer Ward, Jr. and Page S. Haselton, both of New York City, of counsel), for plaintiff.

Charles Neave, Henry R. Ashton, W. J. Barnes, F. T. Woodward, and E. J. Driscoll, all of New York City, for defendant.

CAMPBELL, District Judge.

Plaintiff brings this suit against the defendant for relief by injunction and damages for the alleged infringement by the defendant, at its studio in Long Island City, of patent No. 1,825,598, issued to Vogt, Massolle, and Engl, by mesne assignments to the plaintiff, for process of producing combined sound and picture films, granted September 29, 1931, on application filed March 29, 1922, corresponding to German application No. V. 16431VI/57a2, filed April 14, 1921. This has been held by the Patent Office to be the effective date under the International Convention.

No evidence was offered showing any commercial activity of the plaintiff, or of any one operating under license from it.

The defendant is a well-known motion picture producer.

This suit is being defended by Electrical Research Products, Inc., the wholly owned subsidiary of the Western Electric Company, formed to take over the commercial distribution of the Western Electric talking motion picture sound recording and reproducing systems which were developed by the research laboratories of the Western Electric and American Telephone & Telegraph Companies.

The defendant is licensed by the Research Products, Inc., to record for talking pictures by means of the Western Electric system, and has from the beginning used that system and apparatus.

The defendant has by answer interposed the defenses of invalidity and noninfringement.

This suit is based on claims 5 to 9, both inclusive, and claim 11 of the patent in suit, but claims 6 and 7 are to be read with the disclaimer, filed November 23, 1932.

Said claims and disclaimer read as follows:

"5. A process for producing a combined sound and picture positive film, for talking moving pictures, comprising, photographing a sequence of pictures on one length of film, and simultaneously photographing on another length of film a corresponding sequence of sounds accompanying the action, separately developing the two negatives in a manner appropriate for each, and printing the sound and picture negatives respectively upon different longitudinally extending portions of the same sensitized film, to form the sound sequence at one side of and along the picture sequence.

"6. A process for producing a combined sound and picture positive film, for talking moving pictures, comprising, photographing a sequence of pictures on one length of film, and simultaneously photographing on another length of film a corresponding sequence of sounds accompanying the action, so that the picture and sound negatives may be separately developed in a manner appropriate for each, and printing the sound and picture negatives respectively upon different longitudinally extending portions of the same sensitized film, to form the sound sequence at one side of and along the picture sequence.

"7. A process for producing a combined sound and picture positive film, for talking moving pictures, comprising, photographing a sequence of pictures on one length of film, and simultaneously photographing on another length of film a corresponding sequence of sounds accompanying the action, so that the picture and sound negatives may be separately developed in a manner appropriate for each, and printing the sound and picture negatives respectively upon the same face of the same sensitized film at different longitudinally extending portions thereof, to form the sound sequence at one side of and along the picture sequence.

"8. The method of producing a talking moving picture record on a single film which comprises photographing simultaneously upon separate films the picture and the sound to form separate negatives, photographing said negative picture record upon a portion of a sensitized film not exposed to a sound record, and photographing the negative sound record on the same face of said last film and at a portion thereof not exposed to the picture record.

"9. The method of producing a talking moving picture record on a single film which comprises photographing simultaneously upon separate films the picture and the sound to form separate negatives, photographing said negative picture record upon a portion of a sensitized film not exposed to a sound record, and photographing the negative sound record on the same face of said last film and at a portion thereof not exposed to the picture record, said last two photographing steps being performed consecutively."

"11. A process for producing a combined sound and picture positive film, for talking moving pictures, comprising, photographing a sequence of pictures on one length of film, and simultaneously photographing on another length of film a corresponding sequence of sounds accompanying the action, separately developing the records of said two lengths of film in a manner appropriate for each, and printing such developed sound and picture records respectively upon different longitudinally extending portions of a single sensitized film, to form the sound sequence at one side of and along the picture sequence."

"Disclaimer.

"To the Hon. Commissioner of Patents:

"Your petitioner, American Tri-Ergon Corporation, a corporation organized and existing under the laws of the State of New York and having a place of business in the City, County and State of New York, represents that in the matter of certain improvements in Process for Producing Combined

Sound and Picture Films, for which Letters Patent of the United States No. 1,825,598 were granted on September 29, 1931 to said American Tri-Ergon Corporation, as assignee by mesne assignments of the inventors, Hans Vogt, Joseph Massólle and Josef Engl, said corporation is the owner of the entire right, title and interest under an assignment dated June 6, 1930 and recorded in the Transfers of Patents of the United States Patent Office, July 3, 1930, Liber T 144, pages 192 to 199, and other assignments referred to in said assignment, and that your petitioner has reason to believe that through inadvertence and without any fraudulent or deceptive intention, the specification and claim of said Letters Patent are too broad, including that of which said inventors were not the first inventors. Your petitioner therefore hereby enters this disclaimer to that part of the claim which it does not choose to claim or hold by virtue of the patent or said assignments, to wit:

"(a) The process as set forth in claim 6, except wherein the picture and sound negatives are separate films at the time of development.

"(b) The process as set forth in claim 7, except wherein the sequence of pictures is photographed upon a film separate from that upon which the sequence of sounds is photographed, and the picture and sound negatives are separately developed, in a manner appropriate for each, and are consecutively printed upon the same sensitized film."

More than nine years elapsed between the date of the filing of the application in question in the United States Patent Office and the date of the granting of the patent in suit, and the claims in suit were introduced by amendment dated July 15, 1931.

During that long period of time the defendant and the Western Electric, its parent company, engaged extensively in the commercial distribution of said Western Electric talking motion picture sound recording and reproducing systems.

At the time of the application in the United States Patent Office for the patent in suit in 1922, it was common and necessary practice in the motion picture industry to compensate, so far as was possible, for over and under exposure of different scenes or takes of motion pictures by under and over development, respectively, of the picture negatives.

This was accomplished by what was known as the rack and tank development, in which each scene was wound on a rack and then submerged in a tank containing the developer, the development being watched by the operator, who from time to time lifted the rack and film from the tank, and, exercising his individual judgment, determined the extent to which the development of the particular scene should be carried.

This, of course, resulted in merely a compromise, inasmuch as no amount of manipulation would make it right, if the exposure was not correct in the first place, but would merely change the degree in which it was not correct.

In recording sound photographically, the negative sound record, it was realized, would be uniformally, if not correctly or normally, exposed (a uniform source of light being used), and therefore should receive a uniform development throughout.

To continue the practice of compensating in the developing of the pictures for under and over exposure of the pictures, the patentees wished to develop their picture records separately from their sound records.

This the patentees described in their specifications as originally filed in the United States, in 1922, as follows:

"In the production of speaking films it is of great advantage especially from the point of view of use, to arrange the sound sequence and the picture sequence upon one and the same material carrier (film).

"In this procedure, however, there frequently occur in consequence of the changing lighting conditions in the cinematographing process, changes in the degree of light and the bromide of silver layer, and this causes the picture sequence to be either overlighted or underlighted.

"As the same film, however, bears close to the picture sequence the continuously normally lighted sound sequence, these differences cannot be removed in the case of combined negatives, by developing, weakening, strengthening, and so forth. They can only be removed by subjecting the underlighted or the overlighted negative places to separate corresponding treatment.

"Technically, this treatment is practically impossible so long as the two sequences are photographed upon the same film."

Further such original specification says: "According to the present invention the difficulty is overcome by either employing entirely separate films for the production of the negatives, or films which are connected during the photographing, but which are separated from one another before the developing."

The difficulty which the patentees were

seeking to overcome was under and over exposure of the different picture scenes, which they proposed to do by developing the negative picture records separately from the negative sound record.

The alleged invention cannot be considered as broadly, for having the picture and sound records on different films, so that they are separately developed, as that was old and there would be no invention.

The paragraph of the specifications last quoted proposes two ways of obtaining the separate negatives: (1) To record sound and picture films on separate films in the first instance; (2) to separate the two records after recording them on the same film. This is shown on the drawings added by amendment.

Fig. 1 shows sound and picture records recorded on separate films of standard width. Fig. 3 shows two negative records recorded on a wide nonstandard film, having three rows of sprocket perforations, and which are severed at either p or u before development. Fig. 2 shows a wide nonstandard positive print produced by printing the separate or separated negative records preferably consecutively on the same film.

The specification states that the two negatives of Fig. 1 or the separated negatives of Fig. 3 may be united or pasted together prior to the printing and then copied "in the usual manner."

In the separate film process of Fig. 1, there are three or four steps depending on whether the two records are or are not pasted together before printing; namely: (1) Exposing: (2) developing; and (3) printing; and, if the two records are pasted together before printing, that constitutes the fourth step.

In the divided film process of Fig. 3, which is claimed in claim 2, there are four or five steps, depending on whether the divided or separated negatives are or are not pasted together or reunited before printing; but this process needs no further consideration as it is not in suit.

The claims in suit may be divided into two groups; namely: (1) Claims 8 and 9, which are two-step claims for exposing and printing; (2) claims 5, 6, 7, and 11, which are three-step claims, the additional step being the developing, claims 6 and 7 being read with the disclaimer.

The specification further states:

"The synchronism is assured in both cases by the perforations and by corresponding marks. The production of the positive films can take place by copying the two negative films preferably consecutively upon the same positive films.

"One can, however, also unite, previously, the two negative films longitudinally together, and then copy this so united negative in the usual manner."

Nowhere in their said original specification or claims did the patentees state or even suggest that it was at all material that the two negatives be printed on the same side or face of the positive film.

Plaintiff's expert says that he finds it by inference which he gets from the specification, and prior practice on this point.

I cannot agree with him.

The most that the patentees in the specification say is that it is desirable to "arrange" the two records "upon one and the same material carrier (film)"; that the production of the positive films can take place by copying the two negative films preferably consecutively upon the same positive films; and, in original claim 1, that the two records are "copied upon single film."

The idea of recording sound on film, of recording pictures on film, or both sound and pictures on the same film, of recording sound and pictures on separate films so as to be able to develop them separately and then project them together, or of printing sound and pictures from separate negatives upon a single film, were separately and collectively old prior to the conception date of either party, neither of which goes back of 1921.

See Greensfelder patent, No. 1,254,684, which disclosed everything but simultaneously recording; De Forest patent, No. 1,446,246.

It is true that Greensfelder recorded his sound record after he took his pictures, instead of doing it at the same time.

There was, however, no novelty in simultaneous recording, as this was old. For example, see Bullis patent, No. 1,335,651, and Craig patent, No. 1,260,337.

█ The plaintiff urges that defendant cannot with good grace contest patentability, in view of the application of Wente, a research engineer of the Western Electric Company, to which he assigned such application; but this contention was not sustained. Wente did make broad claims as is customary, but those broad claims were canceled on the first amendment, and as I believe on Greensfelder rather than on the Vogt British patent. In any event, claims similar to some of the Wente claims so canceled were made by

Craig, in 1913, and canceled as unpatentable at that time.

The claims of the patent granted to Wente are limited, and I do not see how his application prejudices the defense in this action.

The plaintiff's expert stated on cross-examination that what he thought was new in the patent in suit, and not found in the prior art, was printing both the separately exposed, separately developed, negatives side by side, on the same side of the positive film.

On redirect examination he stated that in addition to what he had previously stated was new over the prior art was the process of simultaneously recording the sound and picture record, and in printing them side by side on different longitudinally extended portions of the same positive film, without regard to whether they are separately developed or not.

The original specifications were amended to state that the separate development step might be eliminated.

This amendment invalidated the two-step claims, as a separate development to overcome under and over exposure of the different picture scenes was the most important part of the disclosure, and by its elimination the invention claimed therein was different and broader than the one disclosed by the patentees in their application as filed.

It was old and well known in the art to have both the picture sequence and sound sequence printed side by side on a positive film, and also to put the sound record beside the picture record on a single film.

Walker patent, No. 1,168,717, discloses that the picture negative and sound negative were put on different longitudinally extending portions of the positive film at different times.

Craig patent, No. 1,260,337, discloses in the negative process recording of sound negatives and picture negatives on separate films, and the two negative films developed separately and printed on opposite sides of one film.

The patentees filed their first application for the alleged invention in Germany, on April 15, 1921, and thereafter within the convention period they filed their application in the United States on March 29, 1922, and their British application on April 11, 1922; all three being substantially identical, including their claims. The original claim 1 was for the two-step process of developing and printing, specifying that the two records are developed separately, but not whether made on one or two films, and then printed on a single film. Claim 2 was limited to these two steps by reference back to claim 1, and added the third step of exposing or photographing the two records on separate films. Claim 3 was limited to the two steps of claim 1 and added two additional steps; namely, the photographing on a single film and the subsequent dividing of that film for separate development. Claim 4 refers back to the several steps of each of the three preceding claims, and adds to the several steps of each the step of reuniting the two negatives before printing.

The application of the patentees in each of the three countries was therefore for a patent for their separate film process.

Defendant offered in evidence the file wrappers and contents of the German patent office, and the British patent office, but I can find no authority for their reception other than to show what was the application originally filed, and the patent that was granted.

The German patent issued to the patentees was published on February 2, 1923.

There was offered in evidence the German patent No. 279,598, of 1914, to Reimer, which specifically claimed: "Process for the making of a film which consists of an image band and a sound band having the distinctive feature that each band is made as an individual separately, and that both bands are thereupon combined with each other."

This appears to exhaust any novelty as a process in the patentees' separate film process.

Defendant also offered in evidence the British specification offered to public inspection by the British patent office on April 15, 1922, four days after it was filed. This was admissible to show the application that was filed.

Defendant also offered in evidence British patent No. 178,442, as printed and placed on sale at the British patent office on December 7, 1922.

Between April 15, 1922, the time of filing, and December 7, 1922, when the application was printed and placed on sale, the fourth paragraph of the specification was changed by substituting the following:

"The process for the production of combined sound picture films hereinafter set forth differs from previous attempts in this direction, chiefly in the perfect synchronization of the sound and picture sequences, whilst permitting of the separate development of the respective negatives necessitated by unavoid-

able variations in the lighting of the films during the initial exposure.

"Attempts have been made to attain the end in view by taking the two negatives separately and independently and subsequently combining the records for reproduction; but it is found impossible to secure full synchronization in this manner.

"It has also been proposed to pass two separate films for the picture and sound records respectively, the film being driven positively and simultaneously by passing over the same sprocket wheel through a talking apparatus and to provide means for producing a series of corresponding identification marks upon the films by aid of which the two films after separate development can be reassembled; but this process also lacks the requisite accuracy of register.

"According to the present invention, the difficulty is overcome by employing films for the production of the negatives which are integral during the photographing, but which are separated from one another before developing.

"After development, these two negative films are reunited and are copied upon the same positive film. In this way, the absolute coincidence of the sound and the picture record, respectively, is assured, whilst the needful difference in treatment can be given during the development."

The patent was published with only one claim, as follows: "Improved process for the production of combined sound and picture records, in which the sound record and the picture record are produced simultaneously on a single film, which is then divided and the two parts developed separately, and afterwards reunited and used to print the single positive record."

This brings us to the United States application.

On April 14, 1922, the day before the British application was opened to the public, the United States Patent Office Examiner acted on the application, and cited the Bullis patent, No. 1,335,651.

On November 25, 1922, shortly before the revamped British patent was published, the patentees canceled all the original claims of the United States application, and inserted a single claim which was identical with the single claim of the British patent, supra.

This action, it seems to me, must have been taken in view of the Bullis patent.

No drawing was filed with the original application, but by amendment a drawing was filed on November 25, 1922.

The defendant frequently referred to counsel's arguments and statements during the progress of the patent through the Patent Office, but these are not admissible to show estoppel, and therefore I have not considered them.

The new claims were specifically limited to the divided film process.

The actions of the patentees on their applications in Great Britain and the United States seem to me to be susceptible of only one interpretation, and that is, that they are intended to and did abandon the alleged invention covered by the claims in suit.

On April 19, 1923, after the British Patent was issued, the Examiner in the United States Patent Office rejected the single claim, stating: "The claim is rejected as not involving invention over Bullis of record. It does not involve invention to make the record on a single film instead of on two films rigidly attached together, especially in view of the fact that the single film is afterwards cut apart as the parts of the united film are taken apart."

The patentees by amendment acquiesced in the rejection and canceled their single process claim without reservation of any kind, and inserted in the amendment two product claims, requiring in each claim one homogeneous film band, on which the sound records and picture records are copied, the first claim being for a composite print produced from separate films, and the second claim for a composite print produced from a cut or divided single film.

The Examiner, on October 15, 1923, rejected claim 1 upon the prior Craig patent, No. 1,260,337, which he held "shows a film on which two separate negatives are copied." He further said: "Claims 1 and 2 are rejected as defining an article by the process of making it. In order that claims of this character may be allowed, it is necessary that the article have physical characteristics which an article made in the old way would not have. This is not true in this case."

The Examiner further said: "Claim 1 is required to be cancelled. In response to the requirement for division contained in the Office Action of April 14, 1922, applicant elected the form in which the records were made on a single film and then cut apart. He cannot now claim the species in which they are now made on two separate films."

No further action was taken for nearly a year.

In the interim plaintiff's present counsel were retained to prosecute the application which they continued during the remaining seven years.

They interviewed the Examiner, and on September 29, 1924, filed an amendment containing two process claims, the obvious purpose of which, it seems to me, was to recapture the process which had been abandoned.

On January 26, 1925, the Examiner rejected both claims, citing Greensfelder patent, No. 1,254,684, and also the abandoned British specification No. 157,751, filed by the patentees of the patent in suit, and corresponding to French patent No. 532,750.

The applicants on April 2, 1925, by amendment added as claims 3 and 4, claims 1 and 3 of patent No. 1,489,314, to De Forest, which had issued a year before, and requested an interference.

On April 6, 1925, the Examiner again rejected the claims on their merits, and said: "Claims 1 and 2 are rejected on Craig, 1,260,-337 in view of Greensfelder, 1,254,684, both of record. It is shown to be old in Craig to take separate synchronous sound and picture records simultaneously, and to then reproduce these two records on a single record strip. Applicant desires to reprint both records on one side only; but this is the teaching of Greensfelder. Note page 3, line 128, to page 4, line 8." The Examiner was the same Examiner who had granted the De Forest patent, and he further said: "Claims 3 and 4 are rejected as not based on the disclosure of applicant. Applicant takes a sound record and a picture record and reproduces these two records on a third film. These claims, however, call for a sound record and a picture record as does applicant, but the claims then define that the sound record is reproduced on the original picture record strip which is not the method of applicant. If, however, it requires that a positive of the sound record be made and a reprint of this be taken on the original picture strip, still it would not be the method outlined by applicant in his specification. The steps are clearly not the same. Referring to the case of the patentee, the reference Craig cited in this action was held not to be a reference against the claims here under consideration, and though the steps in the method of applicant and of Craig are the same, yet the claims of patentee were held patentable over Craig. Therefore, it is evident that applicant cannot make the claims of the patentee as applicant does not disclose such a method in his application."

On April 23, 1925, the patentees filed another amendment.

On April 27, 1925, the Examiner allowed the divided claim, but finally rejected claim 1 and claims 3 and 4, of the two De Forest claims.

From this action an appeal was taken to the Examiners in Chief.

Under the rule of the Patent Office, no question of patentability or invention could be considered in connection with the De Forest claims, because those claims were taken from an issued patent, and the Examiners did not find a clear anticipation.

Having decided that the patentees could make the De Forest claims, the Examiners under the rule rendered a perfunctory decision as to the patentability of the other appealed claim which was more limited by specifying the separate development step, and said: "The Examiner allowed these claims, which is evidence of their patentability, notwithstanding that the Greensfelder patent was prior art, and which shows the printing of the two positives side by side, Fig. 5, as does also the Craig patent as above set forth. Greensfelder does not photograph his negatives simultaneously. While the disclosure in these patents may tend toward a possibility of doubt as to invention being involved in the process defined by claim 1, the grant of the patent to De Forest and the lack of clear anticipation in either of the references or in their combination as to the addition or substitution of features in one not shown in the other and involving the question of invention vs. mechanical skill, we are of the opinion that claim 1 should be allowed in the absence of more pertinent and anticipatory art and appellants allowed to be placed in interference with De Forest to determine the question of priority."

The interference was decided on the merits in favor of the patentees by the Examiner of Interferences and also by the Board of Appeals, and an appeal was then taken to the Court of Customs and Patent Appeals, in which last named court, on the argument, counsel for De Forest in effect conceded priority to the patentees, and the decision of the Board of Appeals was affirmed.

I have not considered the arguments or briefs on the interference, as I am not satisfied that they are admissible.

The interference with the De Forest claims should not have been allowed. Those claims were for a different process than that dis-

closed by the patentees. This appears to me to have been conceded by plaintiff's counsel in his opening statement on this trial.

Those claims could never have dominated the patent in suit, for, if so broadly construed, they would not have been sustained over the Craig patent, No. 1,260,337, as the claims themselves read on the Craig patent, if the limitation to the additional rephotographing step is not given its intended meaning.

What De Forest taught and the meaning of the claims clearly appears from the specification of his patent, and that was, instead of printing his sound and picture records directly onto a positive film, as in the patent in suit, De Forest introduced the separate and distinct additional step, namely, a photographing or rephotographing of the sound record onto the original picture negative to obtain "a more exact and faithful photograph containing any details of the finest light variations produced by sound waves." De Forest preferred to make the original sound record larger in size than could be accommodated with the pictures on the positive film, and to reduce its size by the additional photographing step.

Except for the interference which was sought on behalf of the patentees and was not forced on them by De Forest, I am convinced that the patent in suit would not have been granted with the claims in suit, and it is worthy of note that the only claims in suit which state that the two records are printed on the same side or face of the film, a point on which plaintiff lays great stress, are claims 7, 8, and 9.

By the amendment of July 15, 1931, the alleged invention of the patent in suit was broadened to eliminate the separate development step, the most important part of the original disclosure, and to disclose the different two-step process of exposing and printing.

Claims 8 and 9, as I have hereinbefore pointed out, are invalid, as they are for a different alleged invention than the original. Motion Picture Patents Co. v. Independent M. P. Co. (C. C. A.) 200 F. 411.

The only other two-step claims in suit, 6 and 7, were by the disclaimer limited to the third step of separate development.

■ Further, the two-step claims in suit and the broadening amendments were not inserted until July 15, 1931, and that was long after the process had gone into public use, and such an attempt should be regarded by the courts

with disfavor. Chicago & N. W. Railway Co. v. Sayles, 97 U. S. 554, 563, 24 L. Ed. 1053.

Plaintiff contends that it made a two-step claim as early as July, 1925, which was when it found the De Forest patent, but even then it was new matter and was not accompanied by the broadening amendments to the specification inserted July 15, 1931.

The alleged invention of the claims in suit is a process and not an article or product.

■ A process consists of certain steps or operations in which the invention, if any, must reside. Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139; Walker (6th Edition) § 19.

The patent in suit is entitled "Process for Producing Combined Sound and Picture Films." It is merely an example of composite or combination printing, a term applied to the making on a single piece of photographic sensitive material prints or impressions from two or more separate negatives, which is very old.

No photographic operation is involved which was not employed in the old art of composite printing which involved both simultaneous and consecutive exposure of separate negatives, separate development of those negatives in an appropriate manner and with different lengths of development, and both simultaneous and consecutive printing of the separate negatives on a single positive film; and was used in both black and white and color photography, and in both still and motion pictures, long before any date important here.

The patentees made no contribution to the art of photography.

Before 1900, sound was recorded photographically.

Photographic recording of sound with motion pictures and producing a combined sound and picture film, the same as the film in use to-day, is described in Haines British patent, No. 18,057, of 1906.

The composite printing process of the patent in suit for sound pictures was adopted as the need arose, and was used by Craig as early as 1913.

The Craig patent, No. 1,260,337, discloses simultaneous recording of sound and pictures on separate films, which are developed separately and printed consecutively on the same positive film, and also shows in Fig. 8 a plurality of sound records printed side by side on the same side of his positive film.

I disagree with plaintiff and agree with

defendant's expert Jones, that the Craig patent was operative.

The Craig patent, as I view it, although this is now disputed by plaintiff, anticipates any invention in the process defined in the claims in suit. It is true that Craig printed his sound record on the opposite, rather than on the same, side of the single positive film, but printing sound and picture records on the same side of the film was well known in the art at that time, and Craig's specification shows that he contemplated printing the sound record on the same side of the film as the pictures, as he says therein:

"It will be noted from what has gone before that so far the negative of the sound record and the negative of the picture record have been made upon separate strips or films. It is necessary, therefore, that these two negatives should be photographically printed upon one film or upon opposite sides thereof."

Even if the patent was silent on that point, the patentees cannot base their monopoly upon the printing of the sound and picture negatives on the same side of the film, which was old and well known, and was not even mentioned in the patentees' original specification.

What the patentees were concerned with was the separate development then required for different portions of the picture negative.

The Greensfelder patent, No. 1,254,684, disclosed, as I understand it, although this is now denied by the plaintiff, everything in the claims in suit but simultaneous recording.

It cannot be distinguished on the ground that it teaches nothing regarding the recording of acoustic vibrations. It discloses photographing of the sound in the sense of photographically producing a sound record, and a picture record, each on separate films, and then printing both on different portions of the same film.

Simultaneous recording of pictures and sounds was obvious and universal practice, and was disclosed in the Craig patent, No. 1,260,337.

Separate development was old and well known in the art, and Craig and Greensfelder separately recorded records would of necessity be separately developed.

Again I disagree with the plaintiff, as it seems to me that the Bullis patent, No. 1,335,651, disclosed everything in the claims in suit but printing the simultaneous and separately developed negatives on a single homogeneous film. His apparent preference was for producing his single positive film, by first printing from his negatives, and then joining them together.

This, however, does not seem to me to be sufficient to relieve the claims in suit from anticipation, as it was old in the art to print on the same film simultaneously and separately developed negatives.

No reason has been shown, nor have I found any, why it is impossible for the Bullis patent and the Craig patent, No. 1,260,337, to be combined together to anticipate the claims in suit; therefore I disagree with plaintiff's contention that they cannot be so combined together.

The Bullis construction is not impractical.

The Bullis patent was cited by the Examiner early in the prosecution of the patent in suit, and, as it seems to me, resulted in the cancellation of the original claims.

From that time on, however, it was undoubtedly lost sight of, and was not called to the attention of the Examiners in Chief, and, while as plaintiff contends it may have been in the file, yet no reference was made to it by them, and, as I consider it a most pertinent reference, it seems to me that the failure to cite it against the claims as finally allowed deprives the patent in suit of the presumption of validity over the prior art.

Walker patent, No. 1,186,717, which is for a combined camera and recorder, was not cited in the Patent Office in the prosecution of the patent in suit, but was a pertinent reference. It discloses the consecutive printing of sound and pictures on the same side of a single positive film of standard width, and I agree with the expert Jones, there "is no functional difference between printing consecutively the picture record and the sound record on the single positive film, as disclosed in this Walker patent, and printing consecutively the separate sound and picture records on a single positive film as disclosed in the patent in suit."

Walker's film is of standard width; the patentees' film is nonstandard.

Walker's film, I believe, could be produced by using the separate negatives of Craig and Bullis, in Walker's printer.

It was everyday practice in the motion picture industry, as early as 1908, to print on standard positive film composite pictures from separately developed negatives.

See testimony of Nonnenbacher, and Messter patent, No. 1,286,383; British patent

to Rossi, No. 21,467, A. D. 1902; and British patent to Downing, No. 6,727, A. D. 1913.

Each of these patentees made their records on separate films, developed them separately, and printed a plurality of records on the same side of the positive of a moving picture film. The process of the patent in suit is not changed from the process of those patents, as it matters not whether the records printed on the same side of the film be sound and pictures, or a plurality of pictures, as the process steps are identical. Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200; Penn. Railroad v. Locomotive E. S. Truck Co., 110 U. S. 490, 4 S. Ct. 220, 28 L. Ed. 222; Dreyfus v. Searle, 124 U. S. 60, 8 S. Ct. 390, 31 L. Ed. 352.

It seems clear to me that in combining the old elements of the claims in suit there was no invention by the patentees, but merely a judicious selection from the prior art. Newcomb, David Co. v. R. C. McMahon Co. (C. C. A.) 59 F.(2d) 899.

■ It is not necessary that all of the elements of an alleged invention be found in one patent. Zimmerman v. Advance Machinery Co. (C. C. A.) 232 F. 866, 869, 870; Dilg v. George Borgfeldt & Co. (C. C. A.) 189 F. 588, 590; Keene v. New Idea Spreader Co. (C. C. A.) 231 F. 701, 708; Linville v. Milberger (C. C. A.) 34 F.(2d) 386, 388; Reflectolyte Co. v. Luminous Unit Co. (C. C. A.) 20 F.(2d) 607, 611.

The question is, not whether the claims in suit are anticipated by any one patent, but whether there is any invention over the prior art, and I am unable to find any such invention.

The three following described patents relate to sound pictures per se:

British patent to Pederson, No. 115,942, A. D. 1918, discloses the recording simultaneously of sound and pictures photographically on a single film. After suitable treatment, the sound negative is separately impressed on the single positive film by embossing, which is a printing operation but not photographic printing, on which the pictures are printed from the original negative.

Kinderman British patent, No. 18,163, of 1913, discloses the attaching to the picture negative of a separate wax-coated strip on which he recorded his sound, simultaneously with his pictures, by means of a stylus.

Reimer German patent, No. 279,598, of 1914, discloses the recording of sound and pictures simultaneously on separate bands, the picture negative being separately developed, and the sound record separately treated by the well-known galvanic process. A copy of the sound record is then made and attached to the separately printed picture positive, forming a single combined sound and picture film.

As to the disclaimer filed herein, after plaintiff had been furnished with a statement showing that both of defendant's films receive the same character of development, it seems to me to be for a purpose that the statute was never designed to permit. Fruehauf Trailer Co. v. Highway Trailer Co. (D. C.) 54 F.(2d) 691.

Even with the disclaimer, claims 6 and 7 show no invention over the prior art.

■ The claims in suit show no invention over the prior art.

Plaintiff recites at length what it contends are the advantages of the alleged invention, but it seems to me that it does not point to any advantage which does not apply to the prior art which I have considered, and some of the advantages recited by plaintiff are not mentioned in the patent in suit.

The cases cited by plaintiff to show validity do not seem to me to be in point.

No commercial success is shown by the plaintiff, and the patentees made no real contribution to the art. The success of the defendant, its licensor, and its licensees is due to the many inventions of the Western Electric Company, without which success would have been impossible.

The claims in suit of the patent in suit are invalid by reason of anticipation and lack of invention over the prior art.

■ The patent in suit is further attacked as invalid under section 4887 of the Revised Statutes, title 35, § 32, U. S. Code (35 USCA § 32), so much of which as is necessary for consideration herein providing as follows: "No person otherwise entitled thereto shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid by reason of its having been first patented or caused to be patented by the inventor or his legal representatives or assigns in a foreign country, unless the application for said foreign patent was filed more than twelve months, in cases within the provisions of section 31 of this title [4886 of the Revised Statutes], and four months in cases of designs, prior to the filing of the application in this country, in which case no patent shall be granted in this country."

Patentees' French patent, No. 532,750, was granted November 21, 1921, on an ap-

plication filed March 25, 1921. This application was filed more than one year before March 29, 1922, the filing date in this country of the patent in suit. The French patent was granted long before the patent in suit.

The prosecution of the application filed in this country April 4, 1921, was abandoned by the applicant.

It seems clear to me, although it is sharply contested by plaintiff, that the French patent is for the same alleged invention as the patent in suit, as it discloses simultaneous recording of sound and picture records on separate films, which, by reason of being separate, are necessarily separately developed, and printing of the separate negatives on the same positive film.

While it is true that what is known as "scoring," in which the sound is recorded after the pictures are taken and while they are being projected, is also disclosed in the French patent, that does not change my opinion hereinbefore stated, that the patent in suit is for the same alleged invention, and that is the question to be determined. General Electric Co. v. Alexander (C. C. A.) 280 F. 852, 854.

Plaintiff's contention that this defendant failed to prove what invention was patented under the laws of France, in the said French patent, is not sustained.

The French patent is in evidence and speaks for itself, and both describes and claims the alleged invention of the patent in suit.

The courts in dealing with this statute have always looked to the claims of the foreign patents and read them in the light of the disclosure and decided what is patented, the same as they do with the domestic patents. Merrell-Soule Co. v. Powdered Milk Co. (C. C. A.) 222 F. 911, 913; Sirocco E. Co. v. B. F. Sturtevant Co. (C. C. A.) 220 F. 137, 143; Commercial Acetylene Co. v. Searchlight Gas Co. (C. C.) 188 F. 85; Siemens' Adm'r v. Sellers, 123 U. S. 276, 282, 8 S. Ct. 117, 31 L. Ed. 153; Leeds & Catlin v. Victor Talking Mach. Co., 213 U. S. 301, 321, 29 S. Ct. 495, 53 L. Ed. 805; Fireball Gas Tank, etc., Co. v. Commercial Acetylene Co., 239 U. S. 156, 165, 36 S. Ct. 86, 60 L. Ed. 191.

See, also, Western Electric Co. v. Citizens' Tel. Co. (C. C.) 106 F. 215, at page 217, where it is expressly stated that the laws of the foreign countries were not proved, but the court held that the foreign patent, an Italian patent having no formal claims, was for the same invention.

The French patent undoubtedly claims the process of claims 6, 8, and 9 of the patent in suit, and I can find no support for plaintiff's contention that the French claims do not touch upon separate development which is specified in claims 5, 7 (by disclaimer), and 11 in suit.

Separately recorded records are described and expressly claimed in the French patent, and the evidence clearly shows that separately recorded records are necessarily separately developed.

Plaintiff's attempt to distinguish between claims 7 and 9 of the patent in suit and the French claims, on the alleged grounds that the latter do not touch upon the matter of consecutive printing, and that the French claims do not state that the films are separate at the time of development (as stated in disclaimer, amendment 6), utterly fails.

Neither is a matter of substance nor constitutes the essence of the alleged invention.

That the films are separate at the time of development is obvious, and claim 5 of the French patent clearly states that the two records are copied on the same film, and it is of no moment whether both records are printed at once, or one after the other.

What is required to constitute identity of a patent within the purview of section 4887 (35 USCA § 32) is substantial, not formal, identity of invention, as covered by the claims. United Shoe Machinery Co. v. Duplessis Shoe Mach. Co. (C. C.) 148 F. 31, 34, 35.

The abandonment of the application based on the French patent, which was for the same alleged invention as that of the patent in suit, made it impossible for the patentees to obtain a United States patent on an application, filed more than one year after the French application, for the alleged invention of that patent. Robert Esnault-Pelterie v. Chance Vought Corporation, C. C. A., Second Circuit, 66 F.(2d) 474, July 17, 1933.

The patent in suit is invalid under section 4887, Rev. St. title 35, § 32, U. S. Code (35 USCA § 32), unless plaintiff can maintain its contention that the application for the patent in suit is a continuing application, and entitled to the dates of the abandoned application.

In order to accord to the patent in suit the date of the abandoned application, intent to continue the earlier abandoned application by means of the application for the patent in suit must be shown.

On the face of the application for the patent in suit, it was entirely independent of, and hostile to, the abandoned application, and nowhere in the prosecution of the application for the patent in suit is there any suggestion of the intent to continue.

Further, it seems to me that, in the prosecution of the application for the patent in suit, the intent to continue was not merely absent, but that the evidence shows an intent not to continue.

As late as April, 1931, in the brief filed on behalf of the patentees in the interference with De Forest, it was stated that the earliest date to which they could carry back the date of application for the patent in suit was "limited to April 14, 1921," the date of the German application corresponding to the patent in suit.

The preliminary statement of patentees in said interference states: "The invention was introduced into the United States by the application papers, viz., the present application Ser. No. 547,860, which papers were received in the United States on or about the 24th day of March, 1922."

It contains no reference to the application for the French patent on which plaintiff now seeks to rely, or to any other foreign application corresponding to the abandoned United States application.

The oath to the application for the patent in suit contains no reference to the application for the said French patent or other corresponding foreign application, as required by the rules of the Patent Office.

On January 26, 1925, the Examiner rejected the patentees' claims on the patentees' own British application, No. 157,751, corresponding to the abandoned United States application and the said French patent.

No attempt was made by the patentees to carry back their date to that of the abandoned application, but they contended that the British complete specification was not accepted and the application had become void, and that, although a publication, it was not available as a reference, as it was not a printed publication more than two years prior to the then pending application.

No mention was made of the French application which had inured into a patent some years before.

It seems clearly established that the patentees did not intend to continue the abandoned application but to prosecute the application for the patent in suit as an independent and hostile application. American Casting Mach. Co. v. Pittsburgh Coal Washer Co. (C. C. A.) 237 F. 590.

That the Scott's abandoned application described in the case last cited was a joint application does not change the situation, as a joint application could, while pending, have been amended to make it a sole application or a new joint application filed while preserving the benefit of the date of the original application. Union Switch & Signal Co. v. Kodel Elec. & Mfg. Co. (C. C. A.) 55 F.(2d) 173; In re Roberts, 49 App. D. C. 250, 263 F. 646; Bijur v. Kennington, 51 App. D. C. 230, 278 F. 313; and Briggs v. Kaisling, 53 App. D. C. 49, 288 F. 254.

The following cases cited by plaintiff are not in point, as in each case a clear intention to continue was expressed while the application was pending: Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952; Corrington v. Westinghouse Air Brake Co. (C. C. A.) 178 F. 711; Novadel Process Corp. v. J. P. Meyer & Co. (C. C. A.) 35 F. (2d) 697.

Plaintiff is debarred from claiming, as it did for the first time on the final hearing of this suit, that the application for the patent in suit is a continuing application, and entitled to the date of its abandoned application.

The patent is invalid.

A decree may be entered in favor of the defendant against the plaintiff dismissing the bill of complaint on the merits, with costs.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court, as provided by Rule 70½ of the Equity Rules (28 USCA § 723) and Rule 11 of the Equity Rules of this court.